IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CAPITAL FUNDING, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 2:20-CV-5-Z |
| | § | |
| TLTX HOLDINGS, LLC, et al., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff seeks the appointment of a receiver for the Lockney Health and Rehabilitation Center and all related personal property (the "Lockney Facility"), the Tulia Health and Rehabilitation Center and all related personal property (the "Tulia Facility"), Lockney Management, LLC ("Lockney Management"), and Tulia Management, LLC ("Tulia Management"), and a temporary restraining order prohibiting Defendants from interfering with the receiver's discharge of its duties. Plaintiff acts pursuant to a final monetary judgment against Defendants issued by the United States District Court for the District of Maryland (the "Maryland Court") that it seeks have enforced by this Court (the "Amarillo Court"), pursuant to Title 28, Chapter 125, Section 1963 of the United States Code.

Having reviewed the judgment from the Maryland Court and all filings in this case, the Court DENIES Plaintiff's motions both for the appointment of a receiver and for a temporary restraining order. Specifically, the Court concludes that Plaintiff cannot satisfy its heavy burden of showing a substantial likelihood of success on the merits and a substantial threat of irreparable harm absent a temporary restraining order. Nevertheless, the Court does believe that some measure

of relief is warranted and provides it as specified in Section (4) of this Memorandum Opinion and Order.

**1. BACKGROUND**

    **A. The Maryland Court**

On September 24, 2013, the Childress County Hospital District (the "Hospital District") entered into a management agreement (the "Management Agreement") with Lockney Management and Tulia Management, who also are among Defendants in this case. Pursuant to the Management Agreement, the Hospital District engaged Lockney Management and Tulia Management as independent contractors to be the managing agents of the Lockney Facility and the Tulia Facility, respectively, and to provide management services as set forth in the Management Agreement. (ECF Nos. 3 at 4 and 4 at 4).

On September 18, 2014, Plaintiff entered into four agreements with Defendants and the Hospital District.

First, Plaintiff entered into a loan agreement (the "Loan Agreement") with Defendants. (ECF No. 3-1). Pursuant to the Loan Agreement, Plaintiff agreed to loan $3,351,652.00 to Defendants for the purposes of refinancing indebtedness secured by the Lockney Facility and the Tulia Facility as well as the real property and improvements thereon. (ECF No. 3 at 3, 3-1 at 5).

Second, Defendants executed a promissory note (the "Note"), pursuant to which they jointly and severally promised to pay the loan to Plaintiff according to the terms of the Loan Agreements. (ECF No. 3-2).

Third, Defendants also executed two documents entitled "Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing" for both the Lockney Facility (the

"Lockney Deed of Trust") and the Tulia Facility (the "Tulia Deed of Trust") to secure their obligations under the Loan Agreement and Note. (ECF Nos. 3-3 and 4-3).

Fourth, Plaintiff entered into two agreements with Defendants and the Hospital District entitled "Subordination and Collateral Assignment of Management Agreement" (collectively, the "Subordination Agreements") for both the Lockney Facility and the Tulia Facility. (ECF Nos. 3-4 and 4-4). Pursuant to the Subordination Agreements, Defendants and the Hospital District agreed that (i) the rights of Lockney Management and Tulia Management under the Subordination Agreements were subordinated to the Loan Agreement, the Note, the Lockney Deed of Trust, and the Tulia Deed of Trust, (ii) the Hospital District assigned the Management Agreement to Plaintiff, and (iii) Lockney Management and Tulia Management granted Plaintiff a security interest in and to its assets related to the management of the Lockney Facility and the Tulia Facility. (ECF Nos. 3 at 4 and 4 at 4).

On September 18, 2017 (the "Maturity Date"), the loan under the Loan Agreement matured and became fully payable. Failure to pay all amounts due and owing on or before the Maturity Date was an event of default under Section 8.1 of the Loan Agreement. (ECF No. 3-1 at 61–63).

On April 4, 2018, Plaintiff commenced an action in the Maryland Court — Civil Action No. 1:19-CV-964-RDB — against Defendants for all amounts owed under the Loan Agreement and Note. (ECF No. 3 at 6–7).

On September 18, 2019, the Maryland Court entered an order granting Plaintiff's motion for summary judgment and entering judgment in favor of Plaintiff and against Defendants in the amount of $2,974,236.36, plus interest (the "Maryland Judgment").

**B. The Amarillo Court**

On December 3, 2019, Plaintiff filed a "Registration of Judgment from Another Court" (ECF No. 1) and an abstract of judgment (ECF No. 2) in this Court.

On January 6, 2020, Plaintiff filed two documents entitled "Plaintiff's Emergency Application for Appointment of Receiver and Temporary Restraining Order" (collectively, the "Applications") (ECF Nos. 3 and 4) for both the Lockney Facility and the Tulia Facility. In the Applications, Plaintiff asserts that under Section 16(d) of both the Lockney Deed of Trust and the Tulia Deed of Trust:

> "[i]f any Event of Default shall have occurred and be continuing, [Plaintiff] . . . shall be entitled as a matter of strict right . . . to the appointment of a receiver to take possession of and to operate the Mortgaged Property and to collect and apply the Rents. The receiver shall have all the rights and powers permitted under the laws of the State where the Mortgaged Property is situated."

(ECF Nos. 3 at 7 and 4 at 7). Plaintiff specifically requested that SAK LT Receiver, LLC, be appointed as receiver for all purposes requested in its Applications, with Suzanne Koenig acting as the primary person on behalf of the receiver. (ECF Nos. 3 at 8 and 4 at 8).

On January 6 — the same day — the Court issued an order setting a hearing on Plaintiff's Applications for 2:00 P.M. (CST) on Thursday, January 9, 2020 (the "Hearing"). (ECF No. 15). The Hearing transpired as scheduled on January 9, with Defendants appearing telephonically.

On January 12, the Court issued an order requiring Defendants to file a response to Plaintiff's Applications no later than 5:00 P.M. (CST) on Monday, January 13, 2020. (ECF No. 19).

On January 13, Plaintiff filed a supplement to its Applications to address certain issues raised at the hearing. (ECF No. 24). On the same day, Defendants filed a response to Plaintiff's Applications that also addressed issues raised at the hearing. (ECF No. 25).

## 2. LEGAL STANDARDS

A federal court sitting in equity has the power to issue a temporary restraining order. FED. R. CIV. P. 65. The standard for a temporary restraining order ("TRO") is generally the same as the standard for a preliminary injunction. *See May v. Wells Fargo Home Mortg.*, 2013 WL 2367769, at *1 (N.D. Tex. May 30, 2013) (Fitzwater, C.J.) (quoting *Asadoorian v. Travis*, 2011 WL 2224984, at *1 (D. Mass. June 7, 2011)). The standard for a preliminary injunction consists of four factors that Plaintiff must establish: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest." *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)); *see also Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (stating that a preliminary injunction "is an extraordinary remedy, not available unless the plaintiff carries his burden of persuasion as to all of the four prerequisites"); *Jones v. Bush*, 122 F. Supp. 2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (unpublished) (stating that preliminary injunctions are "not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion").

Put another way, "[t]he decision to grant a preliminary injunction 'is to be treated as the exception rather than the rule.'" *Id*. (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985)). "'The decision whether to grant a preliminary injunction is within the discretion of the court, but it is an extraordinary remedy that should only be granted if the movant has clearly carried its burden.'" *John Crane Prod. Solutions, Inc. v. R2R & D, LLC*, 861 F. Supp. 2d 792, 794 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *TGI Friday's, Inc. v. Great Nw. Rest., Inc.*, 652 F. Supp. 2d 763, 767 (N.D. Tex. 2009) (Fitzwater, C.J.)). Its primary purpose is "to preserve the court's ability to render a meaningful decision after a trial on the merits." *Callaway*, 489 F.2d at 573.

## 3. ANALYSIS

The Court's analysis of the Applications follows the four factors for a TRO listed above. Since Plaintiff is seeking a TRO as a means of enforcing the Court's potential appointment of a receiver, the Court considers *receivership* as the ultimate relief that Plaintiff is requesting. Accordingly, in analyzing the first prong in the temporary restraining order test, the Court will also analyze whether Plaintiff has met the requirements for receivership.

**A. Substantial Likelihood of Success on the Merits**

The Court first examines the question of governing law regarding receivership. Defendants observe that the Loan Agreement contains a choice-of-law provision stating that the "validity, interpretation, enforcement and effect of [the Loan Agreement] shall be governed by, and construed in accordance with, the laws of the State of Maryland." (ECF No. 25 at 3); *see also* (ECF 3-1 at 70). Defendants also aver that the Note is governed by Maryland law on the basis of a similar provision. (ECF No. 25 at 3); *see also* (ECF 3-2 at 3). From this, Defendants conclude that "all matters relevant to the ability of the Plaintiff to seek enforcement of the Loan Documents under

6

their terms have been contractually agreed to be submitted to the identified Courts of Maryland." (ECF No. 25 at 4). Because Plaintiff seeks the appointment of a receiver under the loan documents — specifically Section 16(d) of the Lockney Deed of Trust and the Tulia Deed of Trust — Defendants aver that Maryland law governs receivership in this case.

Plaintiff, however, argues that the Lockney Deed of Trust and the Tulia Deed of Trust both contain a choice-of-law provision stating that "[t]his Security Instrument . . . shall be governed by the laws of the jurisdiction in which the Mortgaged Property is located." (ECF No. 24 at 3–4); *see also* (ECF Nos. 3-3 at 27, 4-3 at 27). Because the mortgaged property — the Lockney Facility and the Tulia Facility — are located in Texas, Plaintiff avers that Maryland law does not govern receivership in this case.

The Court does not need to resolve this dispute at this time because Plaintiff is not entitled to the appointment of a receiver under either Defendants' or Plaintiff's choice-of-law theory.

### *Defendants' Choice-of-Law Theory*

Under Defendants' choice-of-law theory, Maryland law governs. Maryland law imposes upon creditors a doctrine of election of remedies, which "applies when a claimant has coexistent and inconsistent remedies, pursues one of them to final judgment, and then pursues the other remedy." *Walter v. Atl. Builders Grp., Inc.*, 180 Md. App. 347, 364 (2008) (citing *Surratts Assocs. v. Prince George's Cty., Md.*, 286 Md. 555, 568 (1979); *Haynie v. Nat'l Gypsum Corp.,* 62 Md. App. 528, 533 (1985)); *see also Herring v. Citizens Bank & Tr. Co.*, 21 Md. App. 527, 542 (1974). ("[T]he doctrine of election of remedies applies only when two positions taken by the same litigant are necessarily inconsistent."). "Among its necessary elements are the following: (1) two or more coexisting remedies between which there is a right of election; (2) inconsistency as to such available remedies; and (3) the actual bringing of an action and pursuing it to a final judgment."

*Preissman v. Mayor of Baltimore*, 64 Md. App. 552, 562 (1985) (quoting *Surratts Assocs.*, 286 Md. at 568).

Defendants argue that "Plaintiff foreclosed upon the Note, resulting in the Maryland Judgment, without electing to pursue a foreclosure of the underlying deed of trust, or a receivership, or other relief contemplated by the secured rights consolidated within the Note." (ECF No. 25 at 5). Defendants thereby conclude that "Plaintiff has elected its remedies and cannot seek further relief under the Loan Documents in this forum."

Defendants fail to demonstrate, however, that Plaintiff's requested remedy of receivership is *necessarily inconsistent* with the relief provided by the judgment of the Maryland Court. The judgment of the Maryland Court was simply a monetary judgment awarding Plaintiff a total of $3,830,022.72, plus a specified interest. (ECF No. 1-1 at 2–3). Because Defendants still have not paid this amount to Plaintiff, Plaintiff is preparing to pursue foreclosure to help satisfy the judgment. (ECF No. 3 at 7, 10). Consequently, Plaintiff seeks the appointment of a receiver to ensure that the Lockney Facility and the Tulia Facility will be adequately maintained during foreclosure proceedings. *Id.* at 10. The Court sees no apparent — let alone *necessary* — inconsistency between this and the judgment of the Maryland Court. Far from conflicting with the Maryland Court's judgment, Plaintiff's anticipated foreclosure action and any receivership attending it would be the very means by which the judgment was ultimately satisfied.

Accordingly, the Court rejects Defendants' choice-of-law theory and their election of remedies defense. This, however, does not mean that Plaintiff prevails and is therefore entitled to the appointment of a receiver or a TRO. Plaintiff fails to prove its entitlement to either form of relief for reasons that follow.

### *Plaintiff's Choice-of-Law Theory*

Under Plaintiff's choice-of-law theory, there are three possible sources of law under which this Court can appoint a receiver. These are (1) the Court's equitable powers under Federal Rule of Civil Procedure 66; (2) Title 3, Chapter 64, Section 64.001(a)(2) and (b) of the Texas Civil Practice and Remedies Code; and (3) Title 1, Chapter 11, Section 11.404 of the Texas Business Organizations Code. The Court examines Plaintiff's request for the appointment of a receiver under the first of these — its equitable powers — for two reasons. First, Plaintiff stated at the Hearing that it sought relief primarily under the Court's federal equity power. Second, the requirements for receivership under both Texas statutes are more demanding than under the Court's equitable powers.[1] Hence, if, as discussed below, Plaintiff fails to meet the receivership requirements under the Court's equitable powers, then it also fails to meet them under Texas law.

Federal Rule of Civil Procedure 66 states that civil rules govern an action involving a receiver. "Under that rule, the appointment of a receiver can be sought 'by anyone showing an interest in certain property or a relation to the party in control or ownership thereof such as to justify conservation of the property by a court officer.'" *Santibanez v. Weir McMahon & Co.*, 105 F.3d 234, 241 (5th Cir. 1997) (citations omitted). However, "[r]eceivership is an extraordinary remedy that should be employed with the utmost caution and is justified only where (1) there is a clear necessity to protect a party's interest in property, (2) legal and (3) less drastic equitable remedies are inadequate, and (4) the benefits of receivership outweigh the burdens on the affected

---

[1] Under Texas law, "appointment of a receiver is a harsh, drastic, and extraordinary remedy, which must be used cautiously." *Estate of Price*, 528 S.W.3d 591, 593–94 (Tex. App. 2017); *see also Davenport v. Wood Motor Co.*, 107 S.W.2d 1093 (Tex. Civ. App. 1937) (citations omitted) ("Receiver is one of the harshest remedies known to the law, and should never be awarded where adequate legal or less onerous equitable remedy is available."); *Parness v. Parness*, 560 S.W.2d 181, 182 (Tex. Civ. App. 1977) (citations omitted) ("It is well settled in Texas that the appointment of a receiver is a harsh remedy and should only be exercised in extraordinary circumstances."). As this Memorandum Opinion and Order makes clear, the receivership requirements under the Court's equitable powers are less stringent than those under Texas law. While federal equity law merely prescribes great caution in the appointment of a receiver, Texas law treats it as an extraordinary remedy that is one of the harshest known to the law.

parties." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (enumeration added) (internal marks and citations omitted).

Regarding the first requirement, there must be a "probability that fraudulent conduct has occurred or will occur to frustrate that claim [or an] imminent danger that property will be concealed, lost, or diminished in value." *Santibanez*, 105 F.3d at 241–42 (5th Cir. 1997) (internal marks and citations omitted). Perhaps most importantly, "the form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion." *Id.* at 241 (internal marks and citations omitted).

Plaintiff argues that these receivership requirements should not be applied to the instant case, offering two reasons. First, Plaintiff argues that the instant case has no factual similarity to *Netsphere*. According to Plaintiff, in *Netsphere*, the Fifth Circuit found that the appointment of a receiver was not appropriate because it was an attempt by a judgment creditor to control a vexatious litigant. By contrast, in the instant case, Plaintiff asserts a consensual, contractual right to a receiver. Second, Plaintiff cites *Riverside Properties v. Teachers Ins. & Annuity Ass'n of America*, in which the court held that it was appropriate that (1) a receivership clause in a deed of trust was considered in determining whether to appoint a receiver and (2) that it was appropriate for the court to appoint a receiver in the case at hand, regardless of whether the property at issue was in danger of being lost, removed, or materially injured. 590 S.W.2d 736, 737–38.

But neither of these arguments is persuasive. Regarding the first argument, even if the particular facts of *Netsphere* are quite distinct from the facts of this case, there is nothing in the *rules* of receivership which *Netsphere* applies that would preclude their applicability to this case. Regarding the second argument, *Riverside* by no means *requires* courts to appoint a receiver when there is a receivership clause in a deed of trust. It only requires that they take the clause into account

10

in determining whether to appoint a receiver and states that it is not inappropriate if they decide to do so. But, as noted earlier, whether to appoint a receiver remains within a court's discretion.

The Court now analyzes in order the receivership requirements discussed above.

***i. Probable Fraud or Imminent Danger That Property Will Be Concealed, Lost, or Diminished in Value***

At the Hearing, Plaintiff argued that Lockney Management and Tulia Management subcontracted the management of the Lockney Facility and the Tulia Facility to SkyBlue Healthcare, LLC, and its affiliates (the "SkyBlue Entities") and that it is not in contractual privity with them. (ECF No. 22 at 23). Plaintiff claims that this poses two dangers to the facilities in question.

First, the SkyBlue Entities have indicated interest in purchasing the facilities, but if they are removed as manager, their interest will dissipate. *Id.* In its supplementary briefing, Plaintiff indicated that the SkyBlue Entities "will at some point between now and the foreclosure sale determine that the cost of operating these two facilities is no longer worth their time and expense, and simply walk away." (ECF No. 24 at 5). Furthermore, Plaintiff claims that there is reason to believe that the SkyBlue Entities might negatively impact the performance of the Lockney Facility and the Tulia Facility to negotiate a lower purchase price. *Id.* at 23–24.

Second, Plaintiff claims that money from the Hospital District is paid to the SkyBlue Entities and is then put into accounts that Plaintiff cannot reach due to a lack of contractual privity. (ECF No. 22 at 25). Specifically, Plaintiff claims that this arrangement diverts funds and streams of revenue from accounts that it has a lien on and that there is no way of knowing whether the funds are being dissipated. *Id.* at 25–26.

The Court finds both reasons unpersuasive. Regarding the first reason, Plaintiff has provided no evidence of an *immediate* danger that the Lockney Facility and the Tulia Facility will

diminish in value. Based on the record before it, the Court finds Plaintiff's claims about the SkyBlue Entities' potential actions and motives in negatively impacting the facilities' performance or "walk[ing] away" to be speculative. Regarding the second reason, no evidence has been presented that funds are actually being dissipated. Moreover, Defendants have presented evidence in the form of wire transfer records that they have been accounting for — and allocating for Plaintiff's benefit — the available revenue of its facilities. (ECF No. 25-1). That Plaintiff's email correspondence omits any reference to dissipation, loss, concealment, or diminution in value also casts doubt on Plaintiff's argument. *See* (ECF No. 25-2, 25-3, 25-4, 25-5).

For these reasons, the Court FINDS that Plaintiff has failed to show that there is probable fraud or an imminent danger that the facilities will be lost, concealed, or diminished in value absent a receiver.

### *ii. No Adequate Legal Remedies*

At the Hearing, Plaintiff argued that there were no other adequate legal remedies apart from receivership. (ECF No. 22 at 38). Specifically, Plaintiff claimed to have served garnishment of the accounts on which it had liens, recovering only nominal amounts in the process. It also contended that sequestration was not possible because Lockney Management and Tulia Management "are special purpose entities that don't own anything other than these facilities." *Id.* at 39. Consequently, Plaintiff conclude that its only remaining option is foreclosure of the facilities, for which receivership is necessary.

While agreeing that foreclosure is perhaps the only remaining legal remedy for Plaintiff, the Court doubts that receivership is *necessary* for a successful foreclosure. As discussed earlier, Plaintiff has failed to demonstrate that an imminent danger to the property exists absent a receiver. Consequently, there remains one more possible legal remedy which Plaintiff has not tried —

ordinary foreclosure without a receiver. If Plaintiff were to try this remedy but fail again, it would have a stronger argument for having met this receivership requirement. But this cannot be known unless the Plaintiff actually attempts that remedy.

For these reasons, the Court FINDS that Plaintiff has failed to show that there are no adequate legal remedies apart from receivership.

### *iii. No Less Drastic Equitable Remedies*

At the Hearing, Plaintiff simply asserted that there were no less drastic equitable remedies. However, Defendants offered multiple potential equitable remedies, such as a limited injunction that would preclude Defendants or the SkyBlue Entities from taking any actions that would disrupt the care of the patients in the facilities, an order permitting Plaintiff to inspect the facilities or relevant financial information of Defendants, or a writ of execution by the sheriff, as allowed by New York law. (ECF No. 22 at 41, 44, 93).

The Court agrees with Defendants. Any of the equitable remedies that Defendants named are not nearly as drastic as the appointment of a receiver. Moreover, several other equitable remedies exist too, and the Court in fact enjoins one such remedy at the end of this Memorandum Opinion and Order.

For these reasons, the Court FINDS that Plaintiff has failed to show that there are no equitable remedies less drastic than receivership.

### *iv. Benefits of Receivership Outweigh Burdens on the Affected Parties*

At the Hearing, Plaintiff explained how the appointment of a receiver would benefit itself as it pursues foreclosure, for the reasons described above. However, it also argued that the appointment of a receiver would be to the benefit of all parties, or at least creditors other than itself. (ECF No. 22 at 46). Since the receiver is an officer of the court, Plaintiff argues, it "has an

obligation to preserve and maximize for the benefit of all parties" and "is answerable to the Court and to everybody." *Id.* at 46–47.

In response, Defendants argued that the appointment of a receiver could potentially harm the patients at the facilities. (ECF No. 22 at 56–57). This is because, as Plaintiff acknowledged, the residents of the facilities are elderly patients in post-surgery rehabilitation and nursing services who would be very sensitive to any abrupt changes in treatment. *Id.* at 52. Defendants also claimed that they were "doing a great job" in caring for the patients and that apart from any economic benefits receivership might offer to Plaintiff, that this case involved "a very human issue" that the Court should consider. *Id.* at 58.

The Court considers this receivership requirement to be the most favorable to Plaintiff. It is undoubtedly true that the appointment of a receiver would benefit Plaintiff and potentially other creditors. At the same time, the Court agrees with Defendants about the weight of patient well-being in this analysis. As a party that would be affected by the appointment of a receivership, the health and recovery of the facilities' patients following receivership cannot be ignored. Plaintiff has provided no evidence either that Defendants are not adequately caring for the patients or that the appointment of a receiver poses no risk of harm to the patients.

In light of all the evidence, the Court concludes that neither party clearly prevails under this final requirement. Consequently, the Court FINDS that Plaintiff has failed to meet its burden under this requirement. Furthermore, even if Plaintiff did show that the benefits of receivership outweigh the burdens on the affected parties, that showing would not affect the Court's ultimate conclusion regarding receivership. This is because Plaintiff would still have failed to satisfy the other three receivership requirements. Such a failure is more than sufficient for the Court to find that Plaintiff is not entitled to the appointment of a receiver.

For all of the foregoing reasons, the Court FINDS that Plaintiff is not entitled to the appointment of a receiver and that it has failed to show a substantial likelihood of success on the merits for the purposes of a TRO.

**B. Substantial Threat of Irreparable Harm**

Plaintiff argues that without the appointment of a receiver and a temporary restraining order to protect it, the value of the Lockney Facility and Tulia Facility will continue to plummet so long as Defendants continue possessing it. At the Hearing, Plaintiff elicited testimony from its employee Laura Deutsch ("Deutsch") stating that given the current trajectory of the facilities, it has "an as-is value on a consolidated basis of 2.7 million," and "an as-stabilized [value of] 3.4 million on a consolidated basis." (ECF No. 22 at 66). However, if the facilities did not survive and residents had to be vacated, the tax-assessed value of the facilities would reduce to $150,000 — a value that cannot satisfy the judgment owed to Plaintiff. *Id.* at 73. When pressed, Deutsch explained that this value — $150,000 — represents only "the land . . . [and] square footage of the building, but not the fixtures." *Id.* at 73.

In response, Defendants explained that the facilities, though "currently operating at a net operating loss at times," "benefit (and suffer) from a fairly captive, yet discrete population base. Accordingly, minor variations in the patient needs of the target communities can greatly impact the revenues of the Facilities." (ECF No. 25 at 9). Defendants further explain that they "are attempting to mitigate these demographic challenges by attracting patients from neighboring communities, with demonstrated success," and "that as a result, minor increase in the patient population will dramatically increase the Facilities' profitability." *Id.* Finally, Defendants aver that "increased revenues are already being realized, with patient census numbers increasing for January," that they have "instituted cost saving measures to reduce operating costs," and that

15

"increased revenues and savings are expected to be reflected on the Facilities' financials in the coming months." *Id.* at 10.

Based on the evidence before it, the Court cannot conclude that Plaintiff will suffer *irreparable* harm absent the extraordinary remedy of a TRO. Deutsch's testimony that the value of the facilities would reduce to $150,000 assumes a worst-case scenario in which *all* of the residents leave the facilities while they are in Defendants' possession. But this scenario is extremely unlikely, and Plaintiff offers no evidence of its potential occurrence. Indeed, Defendants' statements suggest that an opposite trend may be developing, in which the number of residents is *increasing*. Moreover, Deutsch's testimony may be based on outdated information. At the Hearing, Deutsch stated that she last received and reviewed a financial statement in August of 2019. (ECF No. 22 at 72–73). Following the Hearing, Defendants provided the Court with more recent financial statements from November of 2019. (ECF Nos. 25-7 and 25-8). While these statements still appear to indicate a net operating loss, it is unclear whether they also indicate any changes in the facilities' financial situations that would alter projected future losses. That information the Court simply lacks. Should this case proceed to application and briefing pursuant to Federal Rule of Evidence 65, the parties will be required to more accurately assess the present and predicted future value of the facilities.

For all of these reasons, the Court FINDS that Plaintiff has failed to show a substantial threat of irreparable harm for the purposes of a TRO.

**C. Threatened Injury Outweighs Harm to Non-Movant**

The Court's analysis for this prong of the temporary restraining order test overlaps considerably with its analysis of fourth requirement for the appointment of a receiver in Section (3)(A)(iv) of this Memorandum Opinion and Order. The Court reaches the same conclusion

regarding this prong that it did in Section (3)(A)(iv): neither party clearly prevails under the requirement in question. The Court therefore FINDS that Plaintiff has not met its burden for this prong. Furthermore, even if it did, that would not affect the outcome of this case as it pertains to the TRO. To receive a TRO, Plaintiff must establish all four prongs discussed in Section (3). But since it has failed to establish the first two prongs, its success or failure on this prong is immaterial.

### D. Injunction Will Not Undermine Public Interest

The Court believes that Plaintiff's strongest arguments are on this final prong of the TRO test. Plaintiff seeks the appointment of a receiver for the protection of the Lockney Facility, the Tulia Facility, and the elderly patients on them, all of which are clearly in the public interest. However, the Court notes that Plaintiff has expressly stated that the *financial* concerns predominate — not the patient care concerns. During the Hearing, Plaintiff asked the Court to "look beyond the physical harm to [the] residents" to the fact that there would be a "non-income-generating building in Lockney and Tulia, a building that's worth basically nothing." (ECF No. 22 at 55). Nonetheless, the Court recognizes the public interest in patient safety. For all of these reasons, the Court FINDS that Plaintiff has shown that an injunction would not undermine the public interest.

## 4. ORDER

It is therefore ORDERED that Plaintiff's Applications (ECF Nos. 3 and 4) are DENIED with respect to both the request for the appointment of a receiver and the request for a temporary restraining order. Based on Plaintiff's Applications, the Hearing, Defendants' briefing and Plaintiff's supplementary briefing, and arguments of counsel for both Plaintiff and Defendants, the Court determines that the following relief is necessary to preserve the status quo at this time and, during the pendency of this matter in this Court, ORDERS:

1. That Defendants maintain appropriate and adequate insurance, continue any current policies in place, and, subject to approval by Plaintiff, purchase further insurance;

2. That Defendants pay all current, past due, and future real estate taxes, property taxes, and any other taxes and assessments against the Lockney Facility or the Tulia Facility;

3. That Defendants maintain all permits, licenses, certifications, and other authorizations as required by federal, state, and local law, monitor price and cost reimbursement or payment levels in the service areas of the Lockney Facility and the Tulia Facility, and, where appropriate, seek approval of appropriate changes to patient rates or payment schedules applicable to the Lockney Facility and the Tulia Facility;

4. That Defendants conduct a complete and thorough analysis — and reconstruction, if necessary — of the Lockney Facility's and the Tulia Facility's financial statements, records, and other information;

5. That Defendants prepare on or before the thirtieth (30th) day after the end of each quarter, commencing on April 30, 2020, a full and complete report, under oath, setting forth for the most recent period since the last report, all receipts and disbursements and the cash balance, and reporting all changes in the assets in their charge, or claims against the assets, that occurred during the preceding month so long as the Lockney Facility and the Tulia Facility remain in Defendants' possession and care and serve a copy of each report on counsel of record for Plaintiff;

6. That Defendants work cooperatively with Plaintiff to provide all necessary operational information relevant to its oversight of the Lockney Facility and the Tulia Facility as a creditor;

7. That Defendants work cooperatively with Plaintiff to continue the allocation of revenues from the Lockney Facility and the Tulia Facility, in excess of their direct operating costs.

Nothing in this Memorandum Opinion and Order shall be construed to prejudice either party should it decide to seek a preliminary injunction or permanent injunctive relief pursuant to Federal Rule of Civil Procedure 65.

**SO ORDERED.**

January 17, 2020.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE